## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-01150

CHARLES WARD,

      Plaintiff,

v.

CITY OF AURORA, COLORADO;
and
OFFICER RANDY ROEDEMA,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

      Plaintiff Charles Ward, by and through undersigned attorneys, respectfully alleges for his Complaint and Jury Demand as follows:

### INTRODUCTION

1. On May 25, 2020, Charles Ward (Mr. Ward) was attempting to access the house he leased when his ex-wife called the police. Two Aurora law enforcement officials, Andrew Brown and Defendant Randy Roedema, came to Mr. Ward's house. Shortly after arriving, these Aurora officers brutalized Mr. Ward, who behaved peacefully and respectfully prior to being shot in the groin with a 40 mm rubber bullet without warning.

2. Aurora officers immediately began attempting to justify the use of force, stating that Defendant Roedema had warned Mr. Ward that he would fire his weapon (he did not) and that Officer Brown had also been trying to force Mr. Ward to the ground prior to

Defendant Roedema shooting Mr. Ward (he did not). The officers charged Mr. Ward with five counts; the court dismissed all counts against Mr. Ward.

3. This act of brutalization by Aurora police officers follows a disturbing pattern by Aurora law enforcement of using force against people of color, particularly Black people, that would not be used against similarly situated white arrestees. Over the past few years, Aurora officers have customarily utilized objectively unreasonable force against Black people, often injuring and sometimes killing them. In these cases, to justify the excessive use of force, Aurora officers charge their victims with crimes. Even when the charges are dismissed, the City of Aurora finds no wrongdoing by the officers and the cycle continues. Mr. Ward now seeks to hold Aurora and its officers accountable for their unconstitutional actions. He brings this Complaint and Jury Demand to vindicate his Fourth and Fourteenth Amendment rights.

## JURISDICTION AND VENUE

4. This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over Plaintiff's claims for attorney fees and costs pursuant to 42 U.S.C. § 1988.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). All events alleged in this Complaint occurred within the State of Colorado.

## PARTIES

6. At all times relevant to this suit, Plaintiff Charles Ward ("Plaintiff") was a citizen and resident of the State of Colorado.

7.  Defendant City of Aurora, Colorado ("Aurora") is a Colorado municipal corporation.

8.  On information and belief, at all times relevant to this suit, Defendant Randy Roedema ("Defendant Roedema") was a citizen and resident of the State of Colorado. At the time of the events forming the basis of this suit, Defendant Roedema was acting within the scope of his employment and under the color of state law in his capacity as an employee of the Aurora Police Department.

## <u>GENERAL ALLEGATIONS</u>

9.  On May 25, 2020, Plaintiff Charles Ward was denied access to his home.

10. Mr. Ward was a cosigner on the lease agreement for the property located at 1671 South Espana Way, Aurora, CO 80017.

11. When Mr. Ward arrived home that night, he found that all of the doors had been locked and he was unable to get in.

12. His estranged wife, Lucinda Ward ("Lucinda Ward"), was inside of the house with her children and refused to unlock the doors for him.

13. Mr. Ward had one of his daughters in his car with him that night, and at the very least, needed to gather supplies to take care of her for the night.

14. Mr. Ward attempted to access his own house through all doors and when he was unsuccessful, he sought out a Sawzall hand-held electric saw to assist him in getting inside his house.

15. Lucinda Ward called 911 and reported Mr. Ward was attempting to break into the home.

16. Dispatch reported that Mr. Ward did not have a weapon.

17. While she was on the phone, Mr. Ward began using the Sawzall on the garage door to open it.

18. At approximately 10:25 p.m., Officer Brown and Defendant Roedema arrived at the residence in response to Ms. Ward's call.

19. In less than one minute of arriving at the residence, Defendant Roedema shot Mr. Ward in the groin with a rubber bullet without warning.

20. When Defendant Roedema and Officer Brown arrived and saw Mr. Ward, Mr. Ward was calmly walking holding a cellphone and the handheld Sawzall.

21. Mr. Ward made no threatening gestures towards Defendant Roedema or Officer Brown.

22. Mr. Ward made no threatening statements towards Defendant Roedema or Officer Brown.

23. As Defendant Roedema and Officer Brown first saw Mr. Ward, Defendant Roedema told Mr. Ward to put his hands up twice and to drop the Sawzall.

24. Within one second of Defendant Roedema giving these instructions, Officer Brown followed up with "Get on the fucking ground now."

25. Defendant Roedema immediately echoed Officer Brown and told Mr. Ward to get on the ground.

26. Mr. Ward calmly complied with the instructions and slowly placed the Sawzall and his cell phone onto the ground.

27. Mr. Ward then slowly stood up.  Mr. Ward slowly and calmly pulled up his shorts that had slipped down.

28. Mr. Ward was visible to Defendant Roedema in the light from Defendant Roedema's flashlight and the light over the garage.

29. Defendant Roedema could see that Mr. Ward's pants had slipped when he was placing the Sawzall on the ground.

30. Defendant Roedema could see that Mr. Ward was pulling up his pants, and he could see that Mr. Ward was not making any threatening gesture or reaching for a weapon. Defendant Roedema knew that Mr. Ward did not have a weapon because Dispatch had noted that there were no weapons.  No reasonable officer could have believed Mr. Ward had a weapon because Dispatch noted that there were no weapons.

31. Defendant Roedema then shot Mr. Ward with a rubber bullet without warning.

32. Defendant Roedema shot Mr. Ward with a rubber bullet within fifteen seconds of first seeing Mr. Ward.

33. Defendant Roedema shot Mr. Ward in the groin, causing injury that required surgery to partially remove Mr. Ward's testicle.

34. Defendant Roedema had an unobstructed view of Mr. Ward when he shot Mr. Ward. Defendant Roedema shot Mr. Ward before Officer Brown made any contact with Mr. Ward.

35. Mr. Ward at no point presented any threat to Defendants Brown and Roedema.

36. Mr. Ward was walking calmly to meet the officers.

37. Mr. Ward never raised the Sawzall as if to attack with it.

38. Mr. Ward complied with all requests from the police officers.

39. Mr. Ward never threatened Officer Brown or Defendant Roedema and never attempted to escape.

40. From the time Officer Brown and Defendant Roedema exited their cars and Defendant Roedema shot Mr. Ward, less than a minute had elapsed.

41. After shooting Mr. Ward, Officer Brown and Defendant Roedema then forced Mr. Ward to the ground and handcuffed him.

42. Mr. Ward was later examined by EMTs for injuries and transported to the Medical Center of Aurora South Hospital.

43. At the hospital, and as a result of being shot by Defendant Roedema, Mr. Ward was diagnosed with a rupture to his right testicle and a large scrotal hematoma surrounding it.

44. Mr. Ward was urgently sent to surgery for a partial orchiectomy and to remove the tissue that was no longer receiving blood flow.

**A. Defendants then attempted to cover up their excessive force by creating a false narrative of the incident.**

45. Only after shooting Mr. Ward did Defendant Roedema inform dispatch via radio that he would be deploying his launcher.

46. Body cam footage from the incident clearly shows the Defendant Roedema deployed his launcher and shot Mr. Ward with a 40 mm rubber bullet without any warning, and informed dispatch only after he had done so.

47. Police reports written after the incident claim that Officer Brown had been in the process of pushing Mr. Ward to the ground, yet body cam footage clearly shows no one was around or touching Mr. Ward at the time Defendant Roedema shot him.

48. After his arrest, officers charged Mr. Ward with five counts: (1) criminal attempt to commit second degree burglary; (2) possession of burglary tools; (3) child abuse; (4) criminal mischief; and (5) harassment.

49. Officer Parrella later undermined the claim that Mr. Ward was attempting to commit burglary by breaking into a house where his ex-wife lived when Officer Parrella informed Mr. Ward that Jaliyah, Mr. Ward's daughter, would be staying with Mr. Ward's ex-wife overnight.

50. When Mr. Ward questioned this, asking, "Why would you keep her with someone that you said I don't live with?" Officer Parrella responded by saying, "it's just a safe place for her to stay tonight."

51. Moreover, the court later dismissed all charges against Mr. Ward, showing these charges were frivolous and only a way to justify the excessive force used against Mr. Ward.

**B. Defendant Aurora's customs, policies, and/or practices caused the violations of Plaintiff's constitutional rights.**

52. Defendants' treatment of Mr. Ward was pursuant to Aurora's custom, policy, and/or practice of unlawful conduct, including but not limited to: racially biased policing; aggression and violence when policing Black people; using excessive force in its law enforcement practices, particularly against Black people; unlawfully detaining, arresting, or charging people, particularly Black people, in order to cover up and justify unconstitutional uses of excessive force; failing to discipline officers, or even find the officers engaged in wrongdoing, in the face of obvious constitutional violations; and failing to adequately train and supervise Aurora officers.

53. Aurora has a longstanding, widespread, and deliberately indifferent custom, habit, practice and/or policy of condoning and ratifying use of unnecessary aggression and excessive force against Black people. As a result, it has become customary among Aurora police officers to use unnecessary aggression that escalates tension and the likelihood of violence when policing Black people and, correspondingly, to use excessive force against Black people. In other words, Aurora has communicated to its officers that such force is authorized and, indeed, expected, and when used will be defended or covered up by the supervisory and municipal apparatus of the City.

54. In the longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of Aurora to permit law enforcement officers to use race and race-based animus as motivating factors in police decisions and actions, as well as to fail to supervise and to train deputies in the rights of individuals to be free from such race-based decision making in law enforcement. This custom, policy, and/or practice has led to Aurora police officers, on a regular basis, using elevated levels of force against Black people.

55. It is the longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of Aurora to permit law enforcement officers to use any hesitation by people of color to comply with an officer's (legal or illegal) commands – even when officer safety is not jeopardized by the hesitation – as justification to use force. In other words, Aurora police officers commonly demand immediate and complete submission by Black people to any police directive, no matter how big or small and no matter whether the command is legal or illegal. Failure to utterly and immediately submit customarily

triggers hostility, aggression, and violence by Aurora police officers. This custom, policy, and/or practice has led to Aurora police officers, on a regular basis, using elevated levels of force against Black people.

56. Aurora officers customarily, and pursuant to the longstanding, widespread, deliberately indifferent customs of Aurora, falsely charge those against whom they use force with a crime (primarily with the resisting arrest, obstruction, and/or failure to obey a lawful order) so as to cover up their use of force. These trumped up and baseless charges are used to make the officers' use of force appear to be justified, when it is anything but.

57. The incident involving Mr. Ward, standing alone, is sufficient evidence of these customs, polices, and/or practices. These unconstitutional customs, policies, and/or practices are further demonstrated by Aurora's history of race-based discrimination and brutality as reflected in both a statistical analysis of its policing and by the many cases brought by the victims of such brutality.

**C. Aurora's unconstitutional customs, policies, and/or practices are demonstrated by many incidents of unconstitutional brutality by Aurora Police Department, especially against Black victims, and racially biased policing by Aurora Police Department.**

58. In addition, many other instances of Defendant Aurora's similar constitutional violations show that use of excessive force by Aurora Police Department officers, especially against Black people and other people of color, is customary and the standard operating procedure in the City of Aurora Police Department, as is racially biased policing. This pernicious, racist custom and practice persists today.

59. For example, on August 24, 2019, Elijah McClain was attacked and killed by Aurora police and paramedics. Aurora officers tackled and assaulted Mr. McClain on his walk

home, using carotid holds, an armbar hammerlock that caused his shoulder to repeatedly pop, and the body weight of multiple officers on top of Mr. McClain after he had been handcuffed. Lying in his own vomit from this abuse, paramedics then injected him with ketamine which led to Mr. McClain losing consciousness and stopping breathing. Mr. McClain died as a result of this. Defendant Roedema was also present in this attack on Mr. McClain and received no discipline as a result from it. A grand jury has since indicted the officers, including Defendant Roedema, on multiple charges stemming from this incident.

60. On August 2, 2020, Aurora Police officers detained and handcuffed Brittany Gilliam, a Black woman, and four Black children, including her six-year-old daughter, at gunpoint after supposedly mistakenly identifying Mr. Gilliam's car as a stolen motorcycle. Aurora Police officers pointed guns at the children and forced them to exit the car and lie on their stomachs; the officers handcuffed two of the children behind their backs. The officers likewise forced Ms. Gilliam to exit the vehicle at gunpoint, handcuffing her and placing her in the back of a patrol vehicle. Video footage of the stop shows the children crying hysterically while surrounded by police officers. The use of force by the officers was clearly excessive, and obviously motivated by racial profiling.

61. On March 1, 2020, an Aurora Police officer confronted Dr. P.J. Parmar, a person of color, when Dr. Parmar arrived at his business. As Dr. Parmar drove up to his garage, he found an Aurora Police officer parked on his property. Dr. Parmar stopped immediately and honked. At that point, the officer jumped out of his car and swore at Dr. Parmar. The officer then pulled out his gun while running toward Dr. Parmar's car. The officer

pointed his gun at Dr. Parmar's head without having any reason to believe that Dr. Parmar was committing or had committed a crime, or posed any threat to the officer or anyone else. Dr. Parmar calmly and repeatedly asked the officer to leave his property, to which the officer repeatedly demanded – without any legal justification – that Dr. Parmar prove that it was his property. Instead of leaving, the officer called in two other Aurora Police officers. The Aurora Police Department had no reasonable suspicion, much less probable cause, for tis officers' seizure of Dr. Parmar, which was clearly motivated by racial profiling.

62. On August 27, 2019, just days after Defendants killed Elijah McClain, Aurora Police Officer Levi Huffine arrested an unidentified Black woman for a suspected municipal code violation. Office Huffine handcuffed the woman and left her hobbled in the back of his patrol car. At some point, the woman slipped such that she was inverted, and her head was at the floor of the patrol car in a dangerous and exceedingly uncomfortable position. Though the woman begged Officer Huffine for help, telling him repeatedly that she could not breathe, that her neck was breaking, and that she did not want to die this way, Office Huffine ignored her please, leaving her in a dangerous, painful position for approximately 21 minutes. Officer Huffine did not so much as look at her as he drove.

63. On November 21, 2018, Jamie Alberto Torres was fixing a car in his garage with friends when a neighbor complained about noises coming from the garage. Aurora Police officers came to Mr. Torres' home solely to investigate this noise complaint, and one of the officers illegally ordered Mr. Torres to exit his garage, threatening to take him to jail. Because Mr. Torres paused momentarily before complying with this illegal order, the

officer grabbed Mr. Torres, wrenched his arm behind his back, picked him up, and slammed him to the ground. Even after handcuffing Mr. Torres, the officer continued to attack Mr. Torres by slamming him to the ground again and wrenching his arm behind his back multiple times. During this encounter, Mr. Torres repeatedly screamed in pain. To justify their illegal conduct, the Aurora Police officers found the Mr. Torres was not guilty of these charges at trial. The Aurora Police investigated its officers' use of force against Mr. Torres by, as is customary, found no wrongdoing. The Aurora Police Department later settled Mr. Torres' lawsuit.

64. In November 2018, Aurora Police officers contacted Tevon Thomas and his companion, a Black woman, because a woman had called 911 to report that she was frightened by them sitting in their car in her apartment building's parking lot at around 4:00 a.m. According to the 911 caller, Mr. Thomas and his companion "did not belong there." Aurora Police officers contacted Mr. Thomas and his friend, who provided a reasonable explanation for their presence in the parking lot and did not give any indication that they posed any danger or threat to the officers or anyone else. Nevertheless, Aurora Police officers forced Mr. Thomas and his friend to exit the car, with the intention of searching the vehicle. Ultimately, a federal judge ruled that although the police had a valid reason to contact Mr. Thomas, Aurora Police "unlawfully extended and turned [it] into an unjustified or extended stop that had, as its motivation and intention, the search of the car and/or Mr. Thomas."

65. On September 6, 2018, Aurora Police officers used excessive force when responding to a car accident involving Andre Williams, a Black man. The officer beat and tased Mr.

Williams for not responding immediately to their order. Even though Mr. Williams showed no signs of aggression or attempting to flee, and in fact was having a seizure, the officers took him to the ground; then, after Mr. Williams had complied with an order to get on his stomach and was surrounded by at least three Aurora Police officers, the officers punched him in the head, struck his legs with their knees, and tased him twice.

66. On July 13, 2017, one Aurora Police officer choke-slammed Vanessa Peoples, a Black woman, while police were performing a welfare check in her home. Several other Aurora Police officers then piled on Ms. Peoples. What "provoked" the officers' attack was Ms. Peoples' protestations of the officers' conduct and her failure to be 100% compliant with every single directive (legal or illegal). Eventually, the officers hog-tied Ms. People so tightly that they dislocated her shoulder. Despite Ms. Peoples' continued cries of pain, Aurora Police officers kept her hog-tied for 30 minutes with her shoulder dislocated. Aurora Police officers had no reason to believe Ms. Peoples had committed a crime; yet they charged her with obstruction. Those charges were later dismissed. Ms. Peoples settled her potential claims against Aurora for $100,000 pre-litigation. Aurora did not discipline any of the involved officers for their unconstitutional actions.

67. On April 22, 2017, multiple Aurora Police officers responded to a car accident that involved Brandon Washington, a Black man. When Mr. Washington, who had hit his head on his vehicle's steering wheel during the crash, dazedly attempted to stand up out of his vehicle, the officers used excessive force by tasing him repeatedly and subjecting him to a variety of other unwarranted physical force, hospitalizing him.

68. On September 14, 2016, an Aurora Police officer used unwarranted excessive force against Dennis Seabaugh while Mr. Seabaugh was detained in an Aurora jail cell. After getting frustrated with Mr. Seabaugh's repeated but ineffectual attempts to hand himself by tying a t-shirt around his neck, the officer stormed into the cell, and without providing Mr. Seabaugh reasonable warning, command, or an opportunity to comply, the officer got on top of Mr. Seabaugh and smashed his head down while simultaneously applying his body weight to pin Mr. Seabaugh down. The officer then smashed Mr. Seabaugh's face into a bench in the cell multiple times, while yanking on his arms; ultimately, the officer use so much force pulling on one of Mr. Seabaugh's arms that he broke Mr. Seabaugh's humerus bone. Aurora settled Mr. Seabaugh's excessive force lawsuit based on the incident.

69. On August 12, 2016, two Aurora Police officers responding to a report of a Black man with a gun ordered several occupants out of a residence, including then-minor Julian Campbell, who was Black. Mr. Campbell came outside as commanded, and subsequently obeyed all orders the Aurora Police officers gave. Nonetheless, the officers grabbed him, slammed him to the ground, handcuffed him, and cited him for disobeying a lawful order. During the subsequent criminal trial of Mr. Campbell, the court granted a motion for judgment of acquittal at the end of the prosecution's case.

70. On March 16, 2016, multiple Aurora Police officers racially profiled Omar Hassan, a Black man, and ejected him from a coffee shop simply because his is a Black man who was wearing a hoodie. The Aurora officers acted solely on the basis of Mr. Hassan's appearance; they had no reasonable grounds for suspecting that he was engaged in any

criminal conduct. Aurora officers told Mr. Hassan that he had to leave the coffee shop, because Mr. Hassan's "kind of business [was] not welcome [t]here." When he questioned the directive, one officer placed her hand on her gun, non-verbally threatening Mr. Hassan with use of deadly force. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid Mr. Hassan to settle his legal claims.

71. On February 19, 2016, Aurora officers stopped and detained Darsean Kelley simply because he was a Black man who happened to be in the vicinity of a reported crime. He questioned the officers' orders and demanded to know whether or not he was being detained. Mr. Kelley complied with the officers' orders but also asserted "I know my rights," just as one officer tased him in the back. The Aurora officers conducting the stop had no reason to believe that Mr. Kelley had committed any crime or was armed or dangerous. To cover up the illegal stop and the unjustified tasing, Aurora charged Mr. Kelley with failure to follow a lawful order. That charge was eventually dismissed, but Aurora found no misconduct and did not discipline any of the officers involved in this unconstitutional detention and use of excessive force. Aurora paid Mr. Kelley $110,000 to settle his legal claims prelitigation.

72. On December 22, 2015, several Aurora Police officers assaulted OyZhana Williams, a Black woman, who was simply visiting her boyfriend in the hospital. When Ms. Williams refused the officer's illegal order that she give him the keys to her car, the officer tackled Ms. Williams, choked her, slammed her head against the ground, and then stomped on her head. Aurora officers had no probable cause or reasonable suspicion to believe Ms.

Williams had committed any crime. Yet, to cover up their excessive force, the officers charged Ms. Williams with a crime and arrested her. The charges were dismissed. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid over $350,000 to settle Ms. Williams' claims.

73. On November 14, 2015, two Aurora officers ordered Dwight Crews, a 60-year-old disabled Black man out of his home under threat of force, despite the fact that the officers had no warrant and no legal justification to effect a warrantless arrest in the home. After Mr. Crews complied, the officers forcefully threw him to the ground because he had momentarily delayed complying with their illegal commands in order to prevent his cat from getting out of his house. To cover up their unconstitutional conduct, the Aurora officers charged Mr. Crews with resisting arrest. The judge dismissed the charge halfway through Mr. Crews' trial. Upon information and belief, Aurora did not discipline the involved officers for their unconstitutional treatment of Mr. Crews. Aurora paid Mr. Crews to settle his legal claims.

74. On June 29, 2015, Aurora Police officers used excessive force against Jeffrey Gale, an unarmed Black man, after a bystander called 911 to report that Mr. Gale had attempted to steal someone's wallet. The bystander reported to the 911 dispatcher that no physical force, threats, or weapon were used in the attempted theft. Mr. Gale was 49 years old, 5'7", weighed approximately 150 pounds, and suffered from gout in both ankles. After locating Mr. Gale, two Aurora Police officers handcuffed him and forced him to the ground, kicking him in the head and back. Five more Aurora Police officers joined in to hogtie Mr. Gale. After he was handcuffed, hogtied, and lying face-down on the ground,

the officers tased Mr. Gale at least three times, both in the back of his ribs and the back of his head. A later medical evaluation showed Mr. Gale suffering from metabolic acidosis from the tasing. All of the officers' body cams were turned off or the tapes destroyed, with the exception of a small portion of video from one officer after Mr. Gale was hogtied. Although Mr. Gale could not be seen during most of this one recording, he could be heard crying out in pain and begging for the officers to stop. One officer responded to his cries of pain by saying, "You better shut the fuck up or this is going to get really ugly for you." Aurora settled an excessive force lawsuit brought by Mr. Gale based on this incident.

75. On March 6, 2015, an Aurora police officer used excessive force in the unjustified shooting and killing of Naeschylus Vinzant-Carter, an unarmed Black man. Mr. Vinzant-Carter was being pursued by Aurora's SWAT team near an elementary school when he was confronted. One officer then opened fire, killing Mr. Vinzant-Carter. Aurora paid $2,600,000 to settle Mr. Vinzant-Carter's claims. Upon information and belief, Aurora did not discipline any of the involved officers for this use of excessive force.

76. On September 25, 2014, an Aurora Police officer used excessive force in arresting Cory Scherbarth by using a leg sweep to drop Mr. Scherbarth to the ground despite his lack of aggression toward the officer or anyone else, but rather in response to Mr. Scherbarth's non-threatening questioning of the officer about his intentions. After Mr. Scherbarth was handcuffed with no resistance, while he was lying on his stomach, Aurora Police officers slammed his head into the ground and punched him in the face, and one officer pressed

his body weight down against Mr. Scherbarth with his knee against Mr. Scherbarth's shoulder.

77. On July 8, 2014, Aurora Police officers used excessive force against Gaye O'Malley, a 55-year-old Black woman, after she called 911 to request medical assistance for her friend who had fallen and injured herself at home. Without justification, an Aurora Police officer took Ms. O'Malley to the ground using an "arm drag takedown," a "twist-lock," and a "prone control hold." The Aurora Police officer had a history of unusually aggressive conduct toward citizens, particularly Black people. Ms. O'Malley was handcuffed, arrested, removed from her home, and charged with assault, battery, obstructing a police officer, resisting arrest, and obstructing municipal operations. Aurora later settled an excessive force lawsuit brough by Ms. O'Malley.

78. On July 3, 2014, Aurora Police officers used excessive force against Adam Bentz in response to his peacefully using his cellphone to record what he perceived as Aurora Police unlawfully towing his vehicle. Despite the fact that there was absolutely no indication that Mr. Bentz posed any physical threat to Aurora Police officers or anyone else, an Aurora Police officer grabbed Mr. Bentz around his neck, applied constricting pressure, and took Mr. Bentz down to the ground. The Aurora Police officer maintained the hold of Mr. Bentz's neck for 80 seconds while other Aurora Police officers restrained Mr. Bentz's limbs, leading Mr. Bentz to lose consciousness and stop breathing, although he was later revived. The force used against Mr. Bentz far exceeded that necessary to arrest him. Aurora later settled a lawsuit brought by Mr. Bentz asserting excessive force.

**D. Defendant Aurora has a custom, policy, and practice of condoning illegal home invasion**

18

79. Aurora has a longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying illegal home invasions so that it has become customary among Aurora police officers to ignore the constitutional sanctity of an individual's home.

80. It is the longstanding, widespread, and deliberately indifferent custom, habit, and/or practice of Aurora to permit law enforcement officers to illegally enter homes or illegally demand a resident exit his or her home, as well as to fail to supervise and to train officers in the rights of individuals to be free from such illegal home invasions. This habit, practice, or custom is exemplified by illegal arrests in the home, as in the case of Mr. Ward, Mr. Torres, and Mr. Crews (described above).

**E. Defendant Aurora is liable for the Individual Defendant's violations of Mr. Ward's rights.**

81. Defendant Aurora's unlawful conduct, as set forth in detail herein, amounts to a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

82. Through Defendant Aurora's continuous ratification of unlawful arrests, excessive force, and biased decision making against people of color, particularly Black people, Defendant Aurora caused the Individual Defendants' illegal conduct.

83. Given Aurora Police Department's long history and widespread practice of Aurora Police officers using excessive force against people, particularly Black people, and/or taking racially-biased actions against Black people, Aurora knew or had constructive knowledge that its officers used excessive and unnecessary force and/or would be influenced by

racial bias when contacting Black people, and that such bias could cause the Aurora Police officers to utilize excessive and unnecessary force against Black people like Mr. Ward.

84. In light of this knowledge, Defendant Aurora could have and should have pursued reasonable methods for training and supervising Aurora Police officers, including the Individual Defendants, in interacting with Black people and the appropriate use of force, but it failed to do so.

85. Moreover, Aurora Police Department persistently failed to meaningfully investigate and discipline numerous Aurora Police officers for their similar uses of excessive force, especially those against Black people. Aurora's failure to find officer wrongdoing and failure to discipline officers in this case and in the cases described above and others reflects a custom, policy, and/or practice of encouraging, tolerating, and/or ratifying blatantly illegal and improper conduct. These encouragements, toleration of, and ratifications demonstrate that such police misconduct is carried out pursuant to the policies of and regimen of training provided by Aurora, and that such conduct is customary within the Aurora Police Department.

86. Aurora's deliberate and conscious failure to correct prior constitutional violations based on similar conduct constituted an affirmative choice to ratify the conduct, and to send a clear message to its law enforcement officers that such misconduct is acceptable and approved. It is Aurora's responsibility to properly train its officers to ensure they perform their duties correctly and to discipline, rather than ratify and encourage, their improper conduct, so that officers can learn from their mistakes and the mistakes of their

colleagues and be deterred from engaging in misconduct that violates the constitutional rights of people with whom the police interact. Aurora's failure to do so has clearly communicated to the Individual Defendants that excessive force, especially against Black people, as well as racially biased policing, is authorized tacitly (or explicitly) encouraged.

87. Aurora's past ratification and toleration of similar illegal conduct thus caused and was the moving force behind the Individual Defendants' use of excessive force against Mr. Ward, and Aurora's failure to discipline the Individual Defendants for this illegal use of force will predictably lead to more unconstitutional conduct in the future.

88. Accordingly, Defendant Aurora knew or had constructive knowledge of the need to provide additional or better training and supervision in and the areas of use of force and avoiding racially biased policing and made a deliberate choice to not adequately train and supervise Aurora Police officers in avoiding excessive force and racially biased policing.

89. Aurora knew or should have known that its acts or omissions in this regard were substantially certain to cause Aurora Police officers to violate individual's constitutional rights, like Mr. Ward's, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to its policy and custom of excessive force, especially against Black people, and/or racially-biased policing, and of failing to provide additional or better training and supervision to Aurora Police officers in these areas.

90. Defendant Aurora was deliberately indifferent to Plaintiff's constitutional rights because Aurora knew or had constructive knowledge that individuals in Mr. Ward's position would be at a substantial risk of suffering dangerous consequences from Aurora's customs, patterns, practices, and/or failure to properly train and supervise its employees.

91. Defendant Aurora could have and should have pursued reasonable methods for the training and supervising of such employees, or disciplining them if they engaged in misconduct, but intentionally chose not to do so.

92. Defendant Aurora fostered "a policy of inaction" in the face of knowledge that Aurora Police officers were routinely violating specific constitutional rights, which constitutes the functional equivalent of a decision by Aurora itself to violate the Constitution.

93. Because Defendant Aurora created and tolerated a custom of deliberate indifference and has continuously failed, despite the obvious need to do so, to adequately train and supervise Aurora Police officers in use of force and avoiding racially biased policing, individuals in Aurora, especially Black people, including Mr. Ward, have repeatedly been subjected to violations of their constitutional rights.

94. Defendant Aurora's policy of failing to act in the face of a long history of excessive force against people, particularly Black people, and its custom, policy, and practice in failing to properly train and supervise its employees despite such history and knowledge or constructive knowledge of such history, were the moving force and proximate cause of Defendants' violation of Plaintiff's constitutional rights.

95. Defendant Aurora's custom, policy, and practice of encouraging, condoning, tolerating, and ratifying racially-biased policing and excessive force, as described herein, and the subsequent cover-ups of such constitutional violations, were the moving force behind, and proximate cause of, Defendants' violation of Plaintiff's constitutional rights.

96. Defendant Aurora's acts or omissions caused Mr. Ward's injuries and significant damages.

97. Defendant Aurora's actions, as described herein, deprived Mr. Ward of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### STATEMENT OF CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – 4th Amendment*
*Excessive Force*
(Against All Defendants)

98. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

99. At all relevant times hereto, the Individual Defendant was acting under the color of state law in his capacity as Aurora law enforcement personnel.

100.     Aurora and the Individual Defendant are "persons" under 42 U.S.C. § 1983.

101.     Under the Fourth Amendment, as incorporated against the stated by the Fourteenth Amendment, Mr. Ward had a clearly established constitutional right to be secure in his person against unreasonable seizures through the use of excessive force.

102.     Under the application of the specific facts and totality of circumstances as described herein, Defendants violated Mr. Ward's clearly established constitutional rights.

103.     Any reasonable law enforcement officer knew or should have known of these clearly established rights at the time of Mr. Ward's injuries.

104.     The Individual Defendant did not have a valid legal basis to seize Mr. Ward in the manner and with the level of force used under the circumstances present.

105.     The Individual Defendant had no warrant authorizing any seizure of Mr. Ward's body.

106.     Mr. Ward had committed no crime (nor could any of the Individual Defendant have reasonably believed he had committed any crime) that would legally justify a warrantless arrest inside one's home, gave the officers no reason to fear for their safety, was obviously unarmed, and was not resisting arrest or fleeing.

107.     The Individual Defendant engaged in the use of force that was objectively unreasonable in light of the facts and circumstances surrounding them, violating Mr. Ward's Fourth Amendment rights.

108.     The Individual Defendant's actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

109.     Any reasonable officer in their position would have known that it was unreasonable to use the amount and type of force used and that to do so would violate Mr. Ward's clearly established constitutional rights.

110.     The Individual Defendant's excessive use of force caused Mr. Ward to be injured.

111.     Defendant Roedema is liable for the excessive use of force against Mr. Ward based on his direct participation in the force used.

112.     At all relevant times, each Individual Defendant had a duty to protect Mr. Ward from harm and unconstitutional treatment.

113.     The Individual Defendant's actions were motivated by malice and/or involved reckless or callous indifference to Mr. Ward's federally protected rights, and the engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating

deliberate indifference to, and a reckless disregard for, Mr. Ward's constitutionally protected rights.

114.    The acts and omissions in which the Individual Defendant engaged were because of and pursuant to the customs, practices, policies, and/or training of Defendant City of Aurora.

115.    As alleged in detail above, Defendant Aurora has a custom, policy, and practice of encouraging, condoning, tolerating, ratifying, and even rewarding the use of excessive force by Aurora Police officers. This is manifested through, among other things, Aurora's grossly inadequate training, supervision, and discipline of Aurora Police officers relating to the use of excessive force.

116.    Defendant Aurora was on notice of the Aurora Police Department's defective customs, policies, and/or practices before the Individual Defendants' excessive use of force against Mr. Ward.

117.    The need for additional and effective use of force policies, training, and/or supervision was obvious, and Defendant Aurora exhibited deliberate indifference to the known and substantial risk of harm to Mr. Ward and others by failing to create adequate use of force policies and/or to adequately train or supervise Aurora Police officers in the use of force.

118.    Defendant Aurora's failure to create and implement adequate use of force policies and/or to adequately train and/or supervise Aurora Police officers in the use of force was substantially certain to cause Aurora Police officers to violate the constitutional rights of individuals like Mr. Ward to be free from excessive force, and Defendant Aurora

consciously or deliberately chose to disregard this risk in failing to change the use of force policies and/or adequately train and/or supervise Aurora Police officers in the use of force. These acts and/or omissions constituted a deliberate choice by Defendant Aurora among several alternatives to pursue a course of action regarding creating and implementing policies, training, and supervision in the area of use of force.

119.     Defendant Aurora set in motion a series of events that they knew would cause Mr. Ward, or an individual in a similar situation as Mr. Ward, to be deprived of his constitutional right to be free from excessive force.

120.     But for the above acts of omissions of Aurora, the Individual Defendants would not have violated Mr. Ward's constitutional rights, and such a deprivation was a natural and foreseeable consequence of Defendant Aurora's acts and omissions.

121.     The acts or omissions of Defendant Aurora and each Individual Defendant were the moving force behind the violation of Mr. Ward's constitutional right to be free from excessive force and proximate cause of Mr. Ward's significant injuries, damages, and losses.

122.     The acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Mr. Ward's injuries and losses, including his physical and mental pain and anguish, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, among other injuries, damages, and losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to this following:

a.  Declaratory relief and injunctive relief, as appropriate;

b.  Actual economic damages as established at trial;

c.  Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

d.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e.  Pre-judgment and post-judgment interest at the highest lawful rate;

f.  Attorney's fees and costs; and

g.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated: July 13, 2022

Respectfully submitted,

*/s/ Igor Raykin*
Igor Raykin
Kishinevsky & Raykin, LLC
2851 South Parker Road, Suite 150
Aurora, CO 80014
Tel: (720) 748-8888
Fax: (720) 748-8894
igor@coloradolawteam.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.


*/s/ Kyle Miller*
Kyle Miller